**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------- X
                                                    :

JANINE DONEN,                            :

                    Plaintiff,          :     Civil Action No.

                                                    :

            v.                          :

                                                  :     **COMPLAINT**

RDG GLOBAL, LLC and RICHARD GOSSETT,  :
in his professional and personal capacities,  :

                                                  :     **Jury Trial Demanded**

                  Defendants.      :
------------------------------------------------------------- X

       Plaintiff Janine Donen, by and through her undersigned counsel, as and for her Complaint against Defendants RDG Global LLC ("RDG" or the "Company") and Richard Gossett, in his professional and individual capacities, alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

       1.      This is an action brought by Plaintiff Janine Donen, a hard-working and successful former Global Director of Sales and Merchandising at RDG, who was the victim of a campaign of sexual harassment and gender discrimination at the hands of RDG and its Chief Executive Officer, Defendant Richard Gossett.

       2.      On its website, RDG, a company that designs and manufacturers apparel, boasts about its business relationships with several women's clothing brands, including Jessica Simpson's "The Warmup." However, behind this façade lies a vile, misogynistic work culture instilled from the top by the Company's CEO and co-founder, Defendant Gossett.

       3.      As a result of this heinous, unchecked conduct, Mr. Gossett and many other male RDG employees have been emboldened to sexually harass, inappropriately touch and demean female RDG employees. Indeed, Mr. Gossett and other male RDG employees exhibit no

hesitation before verbally assaulting female RDG employees or subjecting them to a sexually hostile work environment.

4.      By way of example only, Mr. Gossett outrageously and continuously pressured Ms. Donen to submit to ***his desire to inject RDG's female employees in their buttocks with a syringe*** filled with what he purported to be vitamins.

5.      Unsurprisingly, Mr. Gossett exploited Ms. Donen's extensive connections in the junior and contemporary women's apparel industry to establish business relationships with retailers with whom RDG had previously been unable to engage, including the apparel company J.Crew.  However, once this was accomplished, Mr. Gossett discriminatorily and unjustifiably reduced Ms. Donen's job responsibilities and prevented her from participating in the very deals she helped establish.  Instead, Mr. Gossett, who would repeatedly proclaim that he preferred business be handled "man to man," inserted male RDG executives and employees to prominent client relationship positions at Ms. Donen's and other female executives' expense.

6.      Shockingly, after RDG was accused of failing to comply with regulatory standards demanded by J.Crew, Mr. Gossett was quick to make Ms. Donen the scapegoat (even though she had repeatedly brought these compliance issues to Mr. Gossett's and others' attention), and discriminatorily terminated her employment under this pretext.

7.      Compounding their unlawful and discriminatory conduct, Defendants have illegally withheld commission payments earned by Ms. Donen and to which she is entitled without any legitimate basis.  Defendants' withholding of Ms. Donen's earned commissions constitutes clear retaliation against her for complaining about the sexually hostile work environment she experienced at RDG.

8.      As a result, Plaintiff brings forth claims against Defendants pursuant to the New York State Human Rights Law, N.Y. Executive Law §§ 290 *et seq*. ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Administrative Code §§ 8-101, *et seq*. ("NYCHRL"), New York Labor Law § 193, and the New York common law.

## JURISDICTION, VENUE AND ADMINISTRATIVE REQUIREMENTS

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1) based on the diversity of residence between the named parties.

10.     Pursuant to 28 U.S.C. § 1391, venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

11.     On July 2, 2018, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging unlawful discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII").  Upon issuance of a Notice of Right to Sue from the EEOC, Plaintiff shall seek leave to amend this Complaint to include claims under Title VII.

12.     Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the New York City Administrative Code.

## PARTIES

13.     Plaintiff Janine Donen is a resident of Paramus, New Jersey, and was formerly employed by Defendant RDG in New York, New York from February 2017 through May 2018 as

its Global Director of Sales and Merchandising.  At all relevant times, Plaintiff met the definition of an "employee" under all applicable statutes.

14.     Defendant RDG is a New York limited partnership, with its principal place of business at 530 Seventh Avenue, Suite 302, New York, New York 10018.  At all relevant times, RDG Global LLC met the definition of Plaintiff's "employer" under all applicable statutes.

15.     Defendant Gossett is, upon information and belief, a resident of New York, New York, is RDG's CEO and co-founder, and supervised Ms. Donen during her employment at RDG.  At all relevant times, Defendant Gossett met the definition of Plaintiff's "employer" under all applicable statutes.

## FACTUAL ALLEGATIONS

### I.       BACKGROUND

16.     RDG is a worldwide apparel design and manufacturing company.  RDG produces apparel both for its own clothing brands, as well as brands with which it is licensed to manufacture apparel.  RDG-associated clothing brands are sold at numerous retailers, including Macy's, Nordstrom, J.C. Penney and Kohl's.

17.     Prior to entering into a business relationship with a retailer, RDG must ensure that the factories which produce its apparel adhere to industry and retailer-mandated safety and social compliance standards, which are rules and regulations developed to help eliminate sweatshops and unsafe work environments in developing countries.

18.     By way of example, one group, Social Accountability International ("SAI"), created the "SA8000" standard – one of the highest standards companies should strive to maintain on core issues, including, but not limited to:  child labor, forced labor, health and safety,

freedom of association and right to collective bargaining, discrimination, discipline, working hours and compensation.[1]

19.     International watchdogs such as SAI regularly audit garment factories in developing countries and issue compliance reports.

20.     In addition to complying with safety and social compliance standards, RDG must also ensure that the factories it engages are able to meet volume, quality and apparel design requirements.

21.     In the apparel industry, the process of finding factories meeting these sets of requirements is called "onboarding."

22.     During this onboarding process, RDG typically assigns one set of employees to ensure that factories meet safety and social compliance standards, and another set of employees to ensure that they meet quality, fabric and technical standards.

## II.     RDG AGGRESSIVELY RECRUITS AND HIRES MS. DONEN

23.     In 2016, RDG and Mr. Gossett aggressively recruited Plaintiff to join the Company as its Global Director of Sales and Merchandising.   By this time, Plaintiff had developed lucrative and deep relationships with apparel companies such as Urban Outfitters, American Eagle, Madewell, J.Crew, Guess, Forever 21 and Nordstrom, with whom RDG desired to open up business relationships.

24.     In fact, prior to joining RDG, Ms. Donen had 20 years of experience in the apparel industry, and had previously owned and operated a design and manufacturing company called Brilliant Designs.   Ms. Donen also owned several high-profile brands in connection with Brilliant Designs.

---

[1] See http://standardsmap.org/assets/media/SocialAccountabilityInternationalSA8000/English/AtAGlance_EN.pdf.

25.     As RDG's Global Director of Sales and Merchandising, Ms. Donen was responsible for creating and managing its junior and contemporary women's apparel division.

26.     Ms. Donen also played a key role in the onboarding process, with responsibility for reviewing factories to make sure that they were able to meet quality, fabric and technical standards.  As a result, Ms. Donen would regularly and closely communicate with, among others, factory owners, suppliers, and apparel treatment facilities, and would need to travel extensively to visit and tour potential factories in Central America, India and China.

27.     Notably, Ms. Donen was not given the responsibility to review factories regarding safety and social compliance standards, nor to oversee the actual production process at factories.

28.     In fact, Mr. Gossett made it clear on many occasions, including in front of others, that *"Janine is not a production manager and needs to concentrate on creating and selling [designs and clothing RDG could produce for retailers.]"*

29.     Rather, at all relevant times, James Bisciello, RDG's Senior Vice President of Costing and Production, and Anna Pavel, RDG's Production Manager, managed all aspects related to the factory production process, while Noreen Ramsundar assisted with social and legal compliance.

30.     As such, Mr. Bisciello, Ms. Pavel, Ms. Ramsundar and other employees were responsible for vetting factories that satisfied safety and social compliance requirements for the global brands with which Ms. Donen worked, such as J.Crew, Urban Outfitters, Forever 21, and American Eagle Outfitters.

### III.    MS. DONEN'S EMPLOYMENT AGREEMENT

31.     Pursuant to a written employment offer (the "Agreement"), RDG offered Ms. Donen a base salary of $175,000 and a year-end bonus tied to profitability, but which would be no less than $25,000.

32.     As set forth in the Agreement, in addition to a base salary, Ms. Donen was "eligible to earn annual cash commissions based on net shipments" to her accounts as follows:

- A 1.0% commission on net shipments that were originated, managed, supervised or otherwise worked on by her above a $1,000,000 minimum threshold; and

- A 2% commission on net shipments that were originated, managed, supervised or otherwise worked on by her above a 28% Gross Profit margin per style.

33.     The Agreement also made clear that:

> Upon termination by RDG Global (except in the case of being Terminated for Cause), [Ms. Donen] will be entitled to the commissions based on the … orders entered in to RDG's system but that have not shipped before [her] final day of employment with the Company.

34.     In December 2017, Defendants, in recognition of her strong performance and dedication to her work, increased Ms. Donen's base salary to $300,000, and paid her 2% commissions on all J.Crew orders.  Notably, Ms. Donen was to begin receiving her commissions on a monthly (rather than quarterly) basis beginning January 2018.

### IV.    RAMPANT GENDER DISCRIMINATION AT RDG

35.     At all relevant times, Ms. Donen reported directly to Mr. Gossett.

36.     Under Mr. Gossett's control, RDG operated as a "boys' club" where female employees were forced to endure unwanted physical touching, sexually explicit comments and a culture that stifled their ability to perform.

37.     It is not possible to include here each and every instance of unwanted sexual harassment that Ms. Donen experienced.   By way of example only, a small sampling of egregious and gender-motivated discriminatory behavior perpetrated by Mr. Gossett include:

- Repeatedly pressuring Ms. Donen to pull down her pants so that he could inject her buttocks with a syringe filled with what he claimed was Vitamin B-12, despite Ms. Donen's protestations that she would never expose herself to Mr. Gossett nor let him inject her with a syringe;

- After his egregious conduct caused a business meeting to abruptly and prematurely end, calling Ms. Donen into his office and grabbing, squeezing and kissing her, and refusing to release his grip until Ms. Donen "accepted his apology";

- Telling Ms. Donen and another female colleague during a flight to China that on a previous flight, he had mistakenly taken Viagra instead of Ambien and "had an erection for 7 hours";

- Suddenly, and without warning, touching Ms. Donen's face, such as to rub a pimple or other blemish and saying, "What *is* that?", or to "adjust" her makeup if she had a bristle from a makeup brush on her cheek;

- Repeatedly and unwelcomingly massaging Ms. Donen's shoulders and neck in front of colleagues, at times applying such force to the point where she was unable to escape his grasp until he decided that he was done touching her;

- Continuously and forcibly hugging Ms. Donen and squeezing her to the point of causing her pain, including times in which he would grab and hug Ms. Donen so tightly that her makeup would smear onto the shoulder of his suit jacket, at which point he would order Ms. Donen, in front of other employees, to "go clean [his] jacket";

- Grabbing Ms. Donen's hand under the table during meetings and gripping it so tightly that she was unable to pull it away from him;

- Removing Ms. Donen from a prominent role involving a potential business deal merely because she was a woman and because he wanted the negotiations to be "*mano y mano*" (*i.e.* "man to man");

- After Ms. Donen decided to wear a skirt and tall black boots to the office one day, looking Ms. Donen up and down while sitting in his office and in front of his female assistant, and saying, "Janine, I like that on you.  You

look good." This made Ms. Donen feel demeaned, objectified and cheap. In fact, Ms. Donen was so embarrassed by Mr. Gossett's behavior that she stopped wearing skirts to the office almost entirely after that (and instead, wore baggy, loose fitting clothes), and stopped wearing makeup daily so as not to "stick out" and be subjected to Mr. Gossett's inappropriate touching and comments;

- While in front of colleagues, grabbing Ms. Donen's cell phone from her hands, reading personal text messages out loud and forwarding personal text messages to himself and others; and

- Retaliatorily and intentionally limiting his communications with Ms. Donen and excluding her from important meetings, emails and business calls anytime she expressed her disapproval of his discriminatory behavior or constructively challenged his business decisions.

38.    In fact, during the business trip to China referenced above, Mr. Gossett, upon information and belief, attempted to manipulate Ms. Donen, who had only been with RDG for a brief period of time by that point, into sleeping in the same hotel room as him. Specifically, when Ms. Donen attempted to check in to the hotel, her bags were brought up to and she was given keys to a room in which she was shocked to find a man's clothes folded and sitting on the bed.

39.    Ms. Donen recognized that these clothes belonged to Mr. Gossett, immediately left the room, and demanded that the hotel provide her with her own room. Later that night, when this was brought up to Mr. Gossett during a dinner the two were having with two of Mr. Gossett's male partners, Mr. Gossett made no attempt to assure Ms. Donen that it had all been a mistake, and instead merely laughed it off and offered no explanation at all.

40.    On another occasion, with Mr. Gossett present, Mr. Bisciello threatened Ms. Donen by saying that he "knows people that can make people disappear." After this outrageous threat was made, Mr. Gossett called Ms. Donen into his office, put his arms around her and squeezed her as she cried, and told her that that everything "would be ok." Mr. Gossett then

audaciously warned Ms. Donen that *she* should "be careful how" she spoke to Mr. Bisciello, and that *she* should not "get Jim upset."

41.     Incredibly, neither Mr. Gossett nor anyone else at RDG ever took any action against Mr. Bisciello for making threats against Ms. Donen's safety.

42.     Indeed, Mr. Gossett would routinely support and defend male employees who engaged in inappropriate, discriminatory and threatening behavior toward female employees such as Ms. Donen.

43.     In contrast, when female employees like Ms. Donen dared to complain against male employees for engaging in inappropriate and unlawful conduct, Mr. Gossett would immediately reprimand them for doing so.

44.     In fact, on at least one occasion, Mr. Gossett actually gave Ms. Donen a write-up after she complained about Mr. Bisciello's inappropriate conduct.

45.     Mr. Gossett's demeaning and discriminatory treatment of Ms. Donen made it substantially more difficult for her to perform her job effectively.

46.     For instance, Ms. Donen experienced anxiety from having to constantly worry about whether Mr. Gossett would suddenly decide to embarrass her or undermine her credibility in front of colleagues, business contacts, and potential clients by engaging in conduct like the described above.

47.     Other female RDG employees were unfortunately also subjected to unlawful, gender-based discrimination at the hands of Mr. Gossett.

48.     By way of example only, shortly before Ms. Donen's own termination, Mr. Gossett and Tracy Gurdock, RDG's head of Human Resources, wanted Ms. Donen to

manufacture purported non-discriminatory reasons for terminating a then-pregnant employee in Ms. Donen's division.

49.     Specifically, Ms. Gurock told Ms. Donen about how she was "handling" another pregnant employee in another department, and offered, at Mr. Gossett's urging, to "coach" Ms. Donen about how to avoid liability when terminating the pregnant employee in Ms. Donen's division.

50.      Ms. Donen, however, made it clear to Ms. Gurock and Mr. Gossett that she would not go along with their heinous, discriminatory plan.

51.     Moreover, and as alluded to above, Mr. Gossett would call Ms. Donen and other female RDG employees into his office, direct them to come around to his side of the desk, and order them to pull down their pants and bend over the desk so that he could inject them in the buttocks with a syringe filled with what he claimed were vitamins.  Female employees, including Mr. Gossett's female administrative assistant and a receptionist, would look on as this occurred in horror and disgust.

52.     Upon information and belief, Ms. Gossett was successful on at least one occasion in convincing a female employee to lift up her dress and allow him to inject her buttocks with a syringe, as Mr. Gossett's female administrative assistant looked on helplessly.

**V.     MR. GOSSETT CONDONES SEXUAL HARASSMENT AND GENDER DISCRIMINATION BY OTHER MALE EMPLOYEES**

53.     Mr. Gossett's disgusting and misogynistic conduct emboldened other male employees to also engage in vile sexual harassment in the workplace, several examples of which are as follows:

- On an almost daily basis, Mr. Bisciello would gratuitously yell and scream at Ms. Donen in front of his staff and her assistant;

11

- Raul Davila, a Guatemala-based RDG employee with whom Ms. Donen regularly worked, would suggest that Ms. Donen go with him to a dance club because that was where "all the sexy woman come to dance";

- Mr. Davila would also tell Ms. Donen that he favored "full busted" women and would point to women he found attractive and ask Ms. Donen to look;

- During a business trip, Mr. Davila, without invitation, told Ms. Donen that he has a wife in Atlanta but women in Guatemala to "fill his needs";

- Mr. Davila would also refer to Ms. Donen as a "crazy emotional woman";

- In response to her complaints about Mr. Davila's inappropriate, sexual comments, rather than meaningfully address them, Mr. Gossett would shockingly tell Ms. Donen to "take out" Mr. Davila to see if they could "bond"; and

- Mr. Gossett would tell Mr. Davila and Mr. Bisciello to "speak man to man" about matters that involved Ms. Donen's clients and projects, effectively urging them to exclude Ms. Donen from communications with which she should have obviously been included.

54.     Mr. Gossett would also simply ignore Ms. Donen's complaints about the inappropriate behavior of other male RDG employees.  However, rather than abide by the law and take action to remedy such conduct, Mr. Gossett harbored animus against Ms. Donen for speaking up and questioning the "boys' club" culture at RDG, eventually resulting in her termination.

## VI.     MS. DONEN'S RETALIATORY TERMINATION

55.     In addition to punishing Ms. Donen for reporting the discriminatory conduct to which *she* was subjected, Mr. Gossett further retaliated against Ms. Donen for complaining about RDG's failure to adhere to important regulatory standards required by J.Crew, one of Ms. Donen's largest accounts.

56.     Specifically, as a result of Ms. Donen's work, RDG secured a multi-million dollar sales commitment from J.Crew, which required Ms. Donen to oversee 15-25 production employees in China, India and Guatemala.

57.     Notably, Mr. Davila was the RDG employee in Guatemala responsible for getting leads on factories for Ms. Donen's consideration and Mr. Gossett's final approval as it related to the J.Crew production.

58.     While Ms. Donen was responsible for selecting factories that met J.Crew's *fabric, technical and quality* requirements, it was the responsibility of Ms. Ramsundar and others to vet and ensure that factories were adhering to J.Crew's heightened safety, social and legal compliance requirements.

59.     As such, Ms. Ramsundar was responsible for disseminating reports about social compliance issues to RDG partners, including J.Crew, and to disclose information about prospective factories and their adherence to compliance standards.

60.     Although Ms. Donen was not responsible for determining whether factories were compliant with safety and social standards, she repeatedly notified and warned Mr. Gossett and other RDG employees that she suspected that the factories RDG was utilizing for the J.Crew production were not compliant with J. Crew's safety and social standards.

61.     In fact, as early as January 2018, Ms. Donen, Mr. Gossett and Ms. Ramsundar, among other RDG employees, became aware that certain Guatemalan factories selected to be used to produce items for J.Crew were not in line with J.Crew's social compliance standards.

62.     Indeed, between January and late-March 2018, senior RDG employees, including Ms. Donen, Mr. Gossett, Ms. Ramsundar and Mr. Davila, exchanged multiple communications about how the Guatemalan factories were not in compliance with J.Crew's standards.  Yet, it was

clear that Mr. Gossett was more interested in turning a quick profit however way he could than with respecting and abiding by the compliance requirements of a key partner/client like J.Crew.

63.     By way of example only, in a March 2, 2018 text to Ms. Donen, a clearly frustrated Mr. Gossett told Ms. Donen that no factories that were in compliance with J.Crew's standards existed to produce the J.Crew orders on time, and that "we have a hundred thousand dollars wired to a factory in Guatemala and we need to get our goods made and out."

64.     In mid-March 2018, Ms. Donen and other RDG employees traveled to Guatemala to meet Mr. Davila and inspect factories there.

65.     As part of this trip, Ms. Donen and other RDG employees visited factories and held meetings with Seung Ro Ahn and James Yun, owners and operators of the Panamerican Textil II SA ("Panamerican") factory.

66.     Based on what they observed, Ms. Donen and her team told Mr. Ahn and Mr. Yun that their factory's protocols were not up to the necessary J.Crew standards.  In response, Mr. Ahn and Mr. Yun, as well as Mr. Davila, became verbally abusive and disparaging towards Ms. Donen.

67.     Unquestionably, the remarks, tone of voice and comments were meant to marginalize and demean Ms. Donen because she is a woman.  Indeed, throughout the day-long meeting, the three men gratuitously and aggressively yelled at and berated Ms. Donen.

68.     In fact, in response to Mr. Ahn's abusive berating of Ms. Donen, one employee even intervened and said, "**stop … your tone of voice is out of line, if she [Ms. Donen] was a man, you would never speak this way**."

69.     In addition, Mr. Davila proclaimed to the entire group, including employees that reported to Ms. Donen, that he was "**not working with an emotional woman**."

70.     Outrageously, the night before Ms. Donen and her team were scheduled to return to New York, Mr. Davila stormed out of a meeting held at a factory located in an unsafe and unfamiliar area, leaving Ms. Donen and the other employees stranded.  This caused Ms. Donen to suffer additional anxiety and fear about how her male colleagues felt emboldened to treat her.

71.     Additionally, one evening during this trip, Mr. Ahn and Mr. Yun made further discriminatory remarks about how they refused to "drink [alcohol] with women," and disparaging remarks about individuals that identify as gay, knowing that one of the employees accompanying Ms. Donen identified as gay.

72.     Ms. Donen reported this meeting, and the egregious and discriminatory manner in which the three men treated her throughout this trip, to Mr. Gossett.  Incredibly, Mr. Gossett's response was to have Mr. Bisciello speak directly to Mr. Davila, Mr. Ahn and Mr. Yun about the non-compliance issues "**man to man**."  Humiliating Ms. Donen further, Mr. Gossett issued this new "**man to man**" directive in front of other, more junior employees.

73.     Ms. Donen also notified Ms. Gurock, the head of Human Resources, about the sexually harassing and abusive behavior that Ms. Donen experienced in Guatemala, and yet, Ms. Gurock showed zero interest in pursuing Ms. Donen's complaints, or even in recording what Ms. Donen had to say.

74.     Notably, because Ms. Donen became so upset at times during the trip that she called and debriefed Mr. Gossett numerous times about what was happening, Mr. Gossett was fully aware of the torture the three men put Ms. Donen through, and how their inexcusable, gender-motivated behavior towards Ms. Donen contributed to RDG's inability to secure appropriate factories.  Yet, Mr. Gossett failed to reprimand the men or remedy the situation in any way.

75.     Instead, Ms. Gossett opted to blame Ms. Donen for the alleged communications breakdown.   According to Mr. Gossett, Ms. Donen's purported "performance failures" were somehow tied to the fact that she is female and not one of the "men."

76.     Despite being fully aware that Mr. Davila had failed to locate any potential factories to use in connection with the J.Crew orders since as early as January 2018, Mr. Gossett falsely represented to J.Crew executives during an April 19, 2018 meeting that he had "no knowledge" about the inadequate factories, the social compliance failures identified in written audits, or even RDG's inability to ascertain proper factories to meet production deadlines.

77.     Like a coward, Mr. Gossett lied to J.Crew executives that he only first heard about such facts on  the day of this meeting, and shifted all blame onto Ms. Donen.

78.     Already aggravated by Ms. Donen's repeated complaints about the discriminatory behavior exhibited by male RDG employees at the New York City office, Mr. Gossett used Ms. Donen's complaints about the way she was mistreated in Guatemala on account of her gender to serve as his pretextual basis for terminating Ms. Donen because of a purported inability to perform.

79.     Shamefully, on May 7, 2018, Mr. Gossett lured Ms. Donen outside of RDG's offices into a local coffee shop where he proceeded to hug her without her consent and tell her that she was fired.

80.     Since that time, Mr. Gossett has engaged in and continues to engage in conduct intended to malign Ms. Donen's reputation both professionally and personally.

81.     Defendants have also unlawfully failed to pay Ms. Donen the commissions she earned as of the time of her termination.

82.     In fact, notably, in April 2018, before her unlawful termination, Ms. Donen spoke with RDG's Chief Financial Officer Matthew Wetty about how she intended to use the commissions she was due to pay some taxes she owed.  Upon information and belief, Defendants used this information to pressure Ms. Donen into signing a release of claims in exchange for a separation payment and her *already-earned* commissions at the time of her termination.

83.     In fact, at the time of her termination, Ms. Donen was notified that she was being terminated "without cause," and thus there was no basis to withhold the commissions she had earned.  Yet, after Ms. Donen rejected Defendants' separation offer and refused to release her claims, Defendants intentionally and unlawfully refused to pay her the commissions she had earned and was owed.

## FIRST CAUSE OF ACTION
**(Gender Discrimination and Hostile Work Environment in Violation of the NYSHRL)**
***Against All Defendants***

84.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

85.     Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYSHRL by, *inter alia*, subjecting her to a hostile work environment and terminating her employment because of her gender.

86.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

87.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

## SECOND CAUSE OF ACTION
### (Retaliation in Violation of the NYSHRL)
### *Against All Defendants*

88.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

89.     Defendants have retaliated against Plaintiff on the basis of her protected complaints by, *inter alia*, terminating her employment.

90.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, as well as an award for her reasonable attorneys' fees and litigation costs.

91.     As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYSHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

## THIRD CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYSHRL)
### *Against Defendant Gossett*

92.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

93.     Defendant Gossett knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYSHRL.

94.     As a direct and proximate result of Defendant Gossett's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

95.     As a direct and proximate result of Defendant Gossett's unlawful conduct, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

### FOURTH CAUSE OF ACTION
**(Gender Discrimination and Hostile Work Environment in Violation of the NYCHRL)**
***Against All Defendants***

96.     Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

97.     Defendants have discriminated against Plaintiff on the basis of her gender in violation of the NYCHRL by, *inter alia*, subjecting her to a hostile work environment and terminating her employment because of her gender.

98.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

99.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

100.    Defendants' unlawful and discriminatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so

reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## FIFTH CAUSE OF ACTION
### (Retaliation in Violation of the NYCHRL)
#### *Against All Defendants*

101.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

102.    Defendants have retaliated against Plaintiff on the basis of her protected complaints by, *inter alia*, terminating her employment.

103.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

104.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the NYCHRL, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress for which she is entitled to an award of damages.

105.    Defendants' unlawful and retaliatory actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting in Violation of the NYCHRL)
#### *Against Defendant Gossett*

106.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

107.    Defendant Gossett knowingly and maliciously aided and abetted the unlawful employment practices, discrimination and retaliation against Plaintiff in violation of the NYCHRL.

108.    As a direct and proximate result of Defendant Gossett's unlawful conduct, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which she is entitled to an award of damages, in addition to reasonable attorneys' fees and costs.

109.    As a direct and proximate result of Defendant Gossett's unlawful conduct, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, for which she is entitled to an award of damages.

110.    Defendant Gossett's unlawful actions were done with willful negligence, or recklessness, or a conscious disregard of the rights of Plaintiff or conduct so reckless as to amount to such disregard of Plaintiff's protected rights under the NYCHRL, for which Plaintiff is entitled to an award of punitive damages.

## SEVENTH CAUSE OF ACTION
### (Breach of Contract)
#### *Against Defendant RDG Global LLC*

111.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

112.    Plaintiff and Defendant RDG entered into a binding contract pursuant to which Plaintiff would be entitled to commission payments for her work pursuant to an agreed upon formula.

113.    Defendant RDG breached and continues to breach its agreement with Plaintiff by failing to pay Plaintiff her earned commissions.

114.    As a direct and proximate result of Defendant RDG'S breach of its agreement with Plaintiff, Plaintiff has suffered, and continues to suffer, monetary harm for which she is entitled to an award of damages to the greatest extent permitted under the law.

## EIGHTH CAUSE OF ACTION
### (Unlawful Deductions in Violation of NYLL § 193)
### *Against Defendant RDG Global LLC*

115.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

116.    New York Labor Law ("NYLL") § 193 prohibits covered employers, such as Defendant RDG, from making deductions from any employee's wages.

117.    Defendant made an unlawful deduction from Plaintiff's wages by failing to pay Plaintiff her earned commission payments.

118.    Defendant RDG does not have a good faith basis to believe that its failure to pay the aforementioned commission payments is in compliance with the NYLL.

119.    As a result of Defendant RDG's willful and unlawful conduct, Plaintiff is entitled to an award of damages in an amount to be determined at trial, plus liquidated damages, prejudgment interest and reasonable attorneys' fees and costs.

## NINTH CAUSE OF ACTION
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)
### *Against Defendant RDG Global LLC*

120.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

121.    Plaintiff and Defendant RDG entered into a binding contract pursuant to which Plaintiff would be entitled to commission payments for her work pursuant to an agreed upon formula.

122.    Defendant RDG owed a duty to Plaintiff to act in good faith and conduct fair dealing under the contract.  Defendant breached and continues to breach this implied covenant of good faith and fair dealing by failing to pay Plaintiff her earned commissions.

123.    As a direct and proximate result of Defendant RDG's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered, and continues to suffer, economic harm for which she is entitled to an award of damages to the greatest extent permitted under law.

### TENTH CAUSE OF ACTION
**(Promissory Estoppel)**
*Against Defendant RDG Global LLC*

124.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

125.    Plaintiff and Defendant RDG entered into a binding contract pursuant to which Plaintiff would be entitled to commission payments for her work pursuant to an agreed upon formula.

126.    Plaintiff reasonably relied on Defendant RDG's promise by, *inter alia*, remaining employed by Defendant and working to generate millions of dollars for Defendant RDG.

127.    Defendant RDG failed to act in accordance with its promise by failing to pay Plaintiff her earned commissions.

128.    As a direct and proximate result of Defendant RDG's failure to act in accordance with its promise, Plaintiff has suffered, and continues to suffer, economic harm for which she is entitled to an award of damages to the greatest extent permitted under law.

## ELEVENTH CAUSE OF ACTION
### (Unjust Enrichment)
### *Against Defendant RDG Global LLC*

129.    Plaintiff hereby repeats, reiterates and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

130.    Plaintiff and Defendant RDG entered into a binding contract pursuant to which Plaintiff would be entitled to commission payments for her work pursuant to an agreed upon formula.

131.    Plaintiff reasonably relied on Defendant RDG's promise by, *inter alia*, remaining employed by Defendant RDG and working to generate millions of dollars of profits for Defendant RDG, but RDG unlawfully failed to pay Plaintiff her earned commissions.  As a result, Defendant RDG was enriched at Plaintiff's expense.

132.    Permitting Defendant RDG to retain the monies it received due to Plaintiff's work would violate notions of good conscience and equity and, thus, Defendant RDG should be required to remit to Plaintiff the monies it received due to her work.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendants, containing the following relief:

A.      A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the State of New York, the City of New York, and the common law;

B.      An injunction and order permanently restraining Defendant RDG Global LLC and its partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from

engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.    An order directing Defendants to reinstate Plaintiff in the position she would have occupied but for Defendants' unlawful conduct;

D.    An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

E.    An award of compensatory damages;

F.    An award of punitive damages;

G.    An award of liquidated damages;

H.    Prejudgment interest on all amounts due;

I.    An award of costs incurred by Plaintiff in prosecuting this action, as well Plaintiff's reasonable attorneys' fees to the fullest extent permitted by law; and

J.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demand a trial by jury on all issues of fact and damages.

Dated: July 26, 2018
      New York, New York                Respectfully submitted,

                                        **WIGDOR LLP**

                                        By: _____
                                            Jeanne M. Christensen
                                            Tanvir H. Rahman
                                            Taylor J. Crabill

                                        85 Fifth Avenue
                                        New York, NY 10003
                                        Telephone:  (212) 257-6800
                                        Facsimile:  (212) 257-6845
                                        jchristensen@wigdorlaw.com
                                        trahman@wigdorlaw.com
                                        tcrabill@wigdorlaw.com

                                        *Counsel for Plaintiff*